# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| JUSTIN GRIFFIN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SACHS ELECTRIC COMPANY, et al.,<br><br>　　　　　Defendants. | Case No. 17-cv-03778-BLF<br><br>**ORDER GRANTING DEFENDANT SACHS'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Re: ECF 85, 89] |

Plaintiff Justin Griffin filed this labor class action on behalf of himself and other workers involved in the construction of the California Flats Solar Project in Central California. On behalf of the putative class, Plaintiff seeks payment for "hours worked" under California law for traveling between a security gate entrance (to the ranch where the project was located) and the solar panel work zone set approximately 12 miles on to the property. Individually, Plaintiff asserts unlawful employment practice, wrongful termination, and intentional infliction of emotional distress claims.

Now before the Court are two motions: Defendant Sachs Electric Company's motion for summary judgment as to Plaintiff's class and individual claims; and Plaintiff's motion for partial summary judgment as to liability against Sachs for failure to compensate the travel time in question. The principal question is whether, under California law, Plaintiff's travel time between the security gate and the work zone constitutes "hours worked" mandating compensation. The Court finds that Plaintiff's travel time between the security gate and his parking lot nearby the work zone does not constitute such "hours worked," and that there is no genuine dispute of material fact that Plaintiff was compensated for travel between his parking lot and the work zone. Nor is Plaintiff's travel time between the security gate and parking lot compensable under Plaintiff's theory of liability pursuant to California Industrial Welfare Commission ("IWC")

1    Order 16-2001 ¶ 5(A).  Thus, Sachs is entitled to summary judgment as to Plaintiff's class claims.

2    In addition, the Court separately finds that Sachs is entitled to summary judgment as to Plaintiff's

3    individual claims.

4         Accordingly, for the reasons discussed below, Defendant Sachs's motion for summary

5    judgment is GRANTED and Plaintiff's motion for partial summary judgment is DENIED.

6    **I.    STATEMENT OF FACTS**

7         **A.    California Solar Flats Project and the Parties to this Action**

8         The California Flats Solar Project ("the Project") involves the construction, operation, and

9    maintenance of a 280-megawatt solar power generating facility in the County of Monterey,

10   California.  *See* Ex. A to Rega Decl., ECF 40-5.  The Project is located on approximately 2,367

11   acres of undeveloped grassland owned by Jack Ranch, a private property.  *See id.*; Rega Decl.[1] ¶ 2,

12   ECF 40-5.  Due to the location of the Project and the presence of two endangered species, an

13   Incidental Take Permit ("ITP") was required under the California Endangered Species Act before

14   work on the Project could begin.  *See* Rega Decl. ¶ 5.  The two endangered species are the San

15   Joaquin Kit Fox and the California Tiger Salamander (together, "the Covered Species").  On

16   October 23, 2015, the California Department of Fish and Wildlife issued an ITP allowing work to

17   commence.  *See generally* Ex. A to Rega Decl.

18        The defendants[2] in this action are Sachs Electric Company ("Sachs") and McCarthy

19   Building Companies, Inc. ("McCarthy") (collectively, "Defendants").  Both performed work on

20   the Project.  McCarthy is a general contractor and Sachs is an electrical subcontractor.  *See* Rega

21   Decl. ¶ 10; McCarthy-Sachs Subcontract, Ex. B to Rega. Decl., ECF 40-5.  McCarthy was

22   retained as general contractor for the Project and subcontracted Sachs to perform electrical work

23   on the Project site, including the installation and wiring of solar panels.  *See* Rega Decl. ¶ 2;

24   McCarthy-Sachs Subcontract, Ex. B to Rega. Decl.  Sachs employed workers on the Project from

25   approximately June 2016 to May 2017.  Rega Decl. ¶ 2.

26   _____

27   [1] Plaintiff objects to portions of the Rega Declaration.  *See* Plaintiff's Opp'n at 25, ECF 54.  These objections are overruled, for the reasons discussed in Section III *infra*.

28   [2] Two additional defendants (First Solar, Inc. and California Flats Solar, LLC) were dismissed without prejudice on July 26, 2018.  ECF 56.

Plaintiff Justin Griffin worked for Sachs as a solar panel installer on the Project from approximately November 20, 2016 to March 3, 2017. *See* Griffin Decl. ¶ 3, ECF 50-2. Griffin obtained employment with Sachs through International Brotherhood of Electrical Workers ("IBEW") Local Union 234 and remained an IBEW member throughout his time working on the Project. *Id.* ¶ 4; Rega Decl. ¶ 11. Griffin's employment with Sachs was terminated on March 3, 2017. Griffin Decl. ¶ 3; Rega Decl. ¶ 18; Notice of Termination, Ex. I to Rega Decl., ECF 40-5.

**B. Travel Time and Travel Rules**

A fence encloses the entire Project site. *See* Griffin Decl. ¶ 5, ECF 50-2. Every work day, Plaintiff entered the grounds of the Project through the same security gate entrance ("the Security Gate") to Jack Ranch. *See* Griffin Decl. ¶ 6; Griffin Depo. at 34:11–24, Ex. 1 to Sachs's Motion, ECF 40-1. The Security Gate is located near the intersection of Highway 41 and Turkey Flats Road in the County of Monterey, California. Griffin Decl. ¶ 5. A guard shack is located at the Security Gate. Griffin Depo. at 34:11–24.

The solar panel zone—where workers installed solar panels—is located many miles within the property. *See* Rega Decl. ¶ 3, ECF 40-5. A solar site access road ("the Access Road") connects the Security Gate with parking lots where workers were assigned to park. *See id.* ¶ 3; Griffin Decl. ¶ 6. The Access Road is approximately 12 miles long and a one-way trip takes approximately 45 to 55 minutes, depending on which parking lot was the assigned destination. *See* Rega Decl. ¶ 3; Griffin Decl. ¶ 8; K. Manhart Decl. ¶ 9, ECF 50-3. From the parking lots, workers are transported by buggy to specific work zones to install and work on solar panels. *See* Rega Decl. ¶ 3; Griffin Depo. at 31:6–10. The buggy ride takes approximately 5 to 15 minutes. *See* Jimenez Decl. ¶ 67, ECF 50-4; Bundren Decl. ¶ 66, ECF 50-6. Sachs's Vice President, Mr. Michael Rega, testified on behalf of Sachs that "[e]mployees are paid beginning at the point when they board the buggy." Rega Decl. ¶¶ 1, 4. Plaintiff presents testimony that some workers heard Sachs management say the work day "is supposed to begin" after the buggy ride. *See* Plaintiff's Opp'n at 2 n.1, ECF 54 (citing Jimenez Decl. ¶ 67; Bundren Decl. ¶ 66). This does not contradict Sachs's sworn testimony that workers were paid for travel time on the buggies. In other words, workers were not paid for travel time on the Access Road but were paid beginning from the

1   point in time when they boarded the buggy.  *See* Rega Decl. ¶¶ 3, 4; *see also* Wilkinson Depo.

2   at 78:11–17, Ex. 10 to Blanchard Decl., ECF 50-1.

3       At new hire orientation, Plaintiff was informed that the only way for workers to enter and

4   exit the Project site was via the Security Gate and Access Road.  *See* Griffin Decl. ¶¶ 7, 9.  It was

5   not feasible to walk or bicycle from the Security Gate to the parking lots, *see id.* ¶ 9, but workers

6   could drive by car, carpool, or take a bus offered by McCarthy that picked up workers at locations

7   throughout a multi-county area, *see* Rega Decl. ¶ 3; Griffin Depo. at 52:12–53:7; Wilkinson Depo.

8   at 39:15–20, ECF 101-1.  Workers could also be dropped off at the Security Gate and Sachs would

9   arrange transportation to the parking lots.  *See* Rega Decl. ¶ 3.  On some days, Plaintiff drove his

10  own car from the Security Gate to his assigned parking lot.  Griffin Depo. at 23:12–22.  On other

11  days, Plaintiff was a carpool passenger with other workers.  *Id.* at 40:13–22.

12      Workers traveling by car were required to present their badges at the guard shack in order

13  to enter through the Security Gate.  *See* Griffin Depo. at 34:11–24.  Whether driving or riding,

14  workers were not required to exit the car, but simply held up their badges for scanning by the

15  person(s) staffing the guard shack.  *See id.* at 37:1–16; 40:13–22; 42:23–43:14.  Plaintiff did not

16  utilize the optional McCarthy bus.  *Id.* at 52:12–16.  Workers who did take the bus were not

17  required to show their badges at the guard shack, but instead were scanned in and out at the

18  beginning and end of the bus ride.  *See* Wilkinson Decl. ¶ 16, ECF 98-2; Wilkinson Depo. at 39:8–

19  40:7, ECF 101-1.

20      Travel on the Access Road was governed by a number of rules.[3]  The ITP issued by the

21  California Department of Fish and Wildlife required the Project to "clearly delineate habitat of the

22  Covered Species within the Project Area with posted signs, posting stakes, flags, and/or rope or

23  cord, and place fencing as necessary to minimize the disturbance of Covered Species' habitat."

24  ITP § 6.12, Ex. A to Rega Decl., ECF 40-5.  Project-related personnel were not permitted to cross

25  Covered Species' habitat and were restricted to existing or project-approved travel routes.  *See id.*

26

27  ───────────────
    [3] Sachs disputes the extent to which some rules existed or applied.  *See* Sachs's Opp'n at 21,
28  ECF 63.  For the instant motions, the Court credits all rules that a reasonable jury could accept
    based on the instant record in Plaintiff's favor.

§ 6.13. Project-related vehicle traffic was restricted "to established roads, staging, and parking areas." *See id.* Moreover, "vehicle speeds [could] not exceed 20 miles per hour to avoid Covered Species on or traversing the roads." *Id.* The speed limit on some portions of the Access Road was further restricted to 5 miles per hour in certain kit fox zones. *See* Rega Decl. ¶ 8, ECF 40-5. The contract between McCarthy and Sachs requires "compl[iance] with all biological buffers and conditions." *See* McCarthy-Sachs Subcontract § 22, Ex. B to Rega. Decl., ECF 40-5.

According to Plaintiff, Defendants (as well as biologists) monitored workers driving on the Access Road. *See* Griffin Decl. ¶ 30; Jimenez Decl. ¶ 31. Plaintiff states that while driving on the Access Road he was not permitted to pass other vehicles (except when a car had broken down or pulled over), was not permitted to drive "in a way that created a lot of dust," and that if a pace car was present he was required to follow it. *See* Griffin Decl. ¶¶ 39, 40, 45, 51. Except for emergencies, workers "were not supposed to stop on the [] Access Road at any [locations] that were not designated" as stops. *See id.* ¶ 56. Defendants provided portable toilets along the Access Road that workers were permitted to use during the drive, but workers "could not stop and get out of our vehicles to relieve ourselves at any location along the [] Access Road other than at these [] toilet[s]." *Id.* ¶ 59.

Defendants informed Plaintiff that workers had been suspended or terminated for improper actions on the Access Road, such as exceeding the speed limit. *See* Griffin Decl. ¶ 35. Speed limits ranged from 5 to 20 miles per hour. *See id.* ¶ 41; Jimenez Decl. ¶ 43. Cattle grazed along the Access Road and workers were not allowed to disrupt the cattle or local wildlife while driving on the Access Road. *See* Griffin Decl. ¶¶ 46, 47. Workers were required to immediately report any accidents that occurred on the Access Road. *Id.* ¶ 36.

Numerous additional rules that applied generally to the Project site applied beyond the Security Gate. At new hire orientation and at worker meetings, Defendants informed Plaintiff and other workers that they were subject to all rules of the Project site once they entered the Security Gate. Griffin Decl. ¶ 32; Jimenez Decl. ¶ 28. These rules included "safety and personal protective equipment rules, discrimination rules, anti-harassment rules, environmental rules, alcohol and drug policies, rules related to being subject to searches for alcohol [and] drugs, no practical jokes,

5

no horseplay rules, no gambling rules, no photography, [and] no loud music." *See* Griffin Decl. ¶ 32. Due to drought conditions and the risk of fires, smoking was permitted only in designated areas (which did not include the Access Road or the interior of vehicles on the Access Road). *See* Rega Decl. ¶ 9; Griffin Depo. at 63:9–13. No firearms were permitted on the Project site. *See* Jimenez Decl. ¶ 39.

Defendants informed workers that Defendants could terminate workers for violating any of the Project site rules. *See* Griffin Decl. ¶ 25. Workers were also required to carry their employee badge from the time they entered the Security Gate to the time they exited. Griffin Decl. ¶ 20. Workers were not permitted to enter the Project site before sunrise and were required to be off the Project site by sunset. *See* Griffin Decl. ¶¶ 16, 17. At the beginning and end of the day, workers driving or riding in cars would sometimes have to wait in line for approximately 10 to 20 minutes to get through the Security Gate due to congestion. *See id.* ¶ 24.

### C. The Parties' Collective Bargaining Agreement

Plaintiff obtained employment with Sachs through IBEW Local Union 234 and was an IBEW member throughout his time working on the Project. *See* Griffin Decl. ¶ 4; Rega Decl. ¶ 11. Griffin's employment with Sachs falls under a collective bargaining agreement ("CBA") between The Monterey Bay California Chapter of the National Electrical Contractors Association and IBEW Local Union 234. *See* Rega Decl. ¶ 12; *see also* CBA, Ex. D to Rega Decl., ECF 40-5. The IBEW did not file a grievance on behalf of Griffin or any other union member for unpaid wages in connection with travel time between the Security Gate and the parking lots on the Project site. Rega Decl. ¶ 13.

### D. Procedural History

Plaintiff filed suit against Sachs in state court on June 22, 2017, alleging six class action claims, including failure to pay compensation due, and three individual claims. *See* Sachs Complaint, Ex. J to ECF 1. Sachs removed the Sachs action to federal court on June 30, 2017. *See* Sachs Notice of Removal, ECF 1. Plaintiff filed a similar suit against McCarthy in state court alleging the same class action claims on March 29, 2018. *See* McCarthy Complaint, Ex. A to ECF 1-1, Case No. 5:18-cv-02623-BLF. McCarthy removed the McCarthy action to federal court

on May 3, 2018.  *See* McCarthy Notice of Removal, ECF 1, Case No. 5:18-cv-02623-BLF.

On July 16, 2018, the Court consolidated the two actions and permitted Plaintiff to file a single consolidated complaint, *see* ECF 46, which Plaintiff did so file on July 23, 2018, *see* Consol. Compl., ECF 51.  On August 6, 2018, Defendants separately filed motions to strike the portions of Plaintiff's Consolidated Complaint that allege labor violations related to Plaintiff's rest and meal breaks.  *See* Sachs Motion to Strike, ECF 59; McCarthy Motion to Strike, ECF 61.  The Court granted both motions in full on January 24, 2019.  *See* Order Granting Motions to Strike Portions of the Consolidated Complaint, ECF 86.  The upshot is that Plaintiff's allegations concerning "meal and rest periods" are not part of the instant action.  *See id.* at 2.  On February 7, 2019, Defendants separately answered Plaintiff's Consolidated Complaint.  *See* ECF 94; ECF 95.

Sachs filed its Motion for Summary Judgment ("Sachs's Motion") on May 29, 2018.  *See* Sachs's Motion, ECF 40.  Plaintiff filed its Motion for Partial Judgment against Sachs ("Plaintiff's Motion") on July 26, 2018.  *See* Plaintiff's Motion, ECF 57.  On September 14, 2018, the parties jointly requested to continue the hearing dates on the parties' respective motions for summary judgment in light of private mediation set in January 2019.  *See* ECF 76.  In response, the Court terminated both motions without prejudice, subject to renotice for a new hearing date.  *See* ECF 77.  The January 2019 mediation did not result in resolution of this action.  On January 24, 2019, Plaintiff renoticed its motion for partial summary judgment.  *See* Plaintiff's Renotice of Motion, ECF 85.  On January 31, 2019, Sachs renoticed its motion for summary judgment.  *See* Sachs's Renotice of Motion, ECF 89.  As permitted by the Court, the parties did not refile the briefing or exhibits in renoticing the respective motions.  Thus, the Court's citations herein refer to the briefing and exhibits filed prior to renoticing.

On March 7, 2019, the Court heard oral argument on the instant motions ("the Hearing").  At the Hearing, the Court granted Plaintiff permission to submit limited references to the existing record with respect to two specific issues discussed at the Hearing.  Plaintiff submitted these references on March 7, 2019, shortly after the Hearing.  ECF 105.  On March 11, 2019, Sachs filed a "Response" to Plaintiff's references.  ECF 107.  Shortly thereafter, Plaintiff filed objections to Sachs's "Response."  ECF 109.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried." *State Farm Fire & Cas. Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987).

The moving party "bears the burden of showing there is no material factual dispute," *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact," *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In judging evidence at the summary judgment stage, "the Court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party." *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513–14 (N.D. Cal. 1995). For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009).

## III. PLAINTIFF'S EVIDENTIARY OBJECTIONS

First, Plaintiff objects to portions of the following four declarations submitted in support of Sachs's motion for summary judgment: Hagan Declaration (ECF 40-3); Kinloch Declaration (ECF 40-4); Rega Declaration (ECF 40-5); and Torres Declaration (ECF 40-2). *See* Plaintiff's Opp'n at 25, ECF 54. In total, Plaintiff objects to 29 separate portions of this testimony. *See id.* However, Plaintiff makes only a blanket objection that purportedly applies to all 29 separate portions—"that [the portions] constitute inadmissible conclusion, the witness lacks personal knowledge of the facts stated, and the statements and exhibits constitute inadmissible hearsay." *Id.* Sachs argues that Plaintiff's objections are "improper" because "Sachs has no idea which challenged paragraph is objectionable on which ground or the reasoning behind any of the

objections . . . [and thus] [i]t is completely unreasonable to expect Sachs to fashion any response." *See* Sachs's Reply at 15, ECF 72. The Court agrees. It is simply not realistic for Sachs or the Court to identify which objections apply to which portions of the objected-to testimony or address the reasoning underpinning any of Plaintiff's objections. Therefore, these objections are improperly formed and are hereby OVERRULED.

Second, Plaintiff objects to the Jensen Declaration (ECF 72-2) submitted by Sachs in support of its reply brief. *See* Plaintiff's Objections to Declaration in Reply Brief, ECF 74. The Court finds the Jensen Declaration (ECF 72-2) irrelevant to the instant motions and the Court does not rely on or consider the testimony therein. Accordingly, Plaintiff's objections at ECF 74 are TERMINATED AS MOOT.

Third, Plaintiff objects to Sachs's "Response" (ECF 107) to Plaintiff's references to the record (ECF 105) submitted shortly after the Hearing. *See* Plaintiff's Objections to Sachs's Response, ECF 109. Plaintiff argues that Sachs's Response asserts new arguments and refers to additional facts outside the record, and that the Court did not give Sachs permission to submit such briefing in response to Plaintiff's references to the record. *See id.* at 2. The Court agrees. Accordingly, Sachs's Response at ECF 107 is hereby STRICKEN.

## IV. DISCUSSION

Plaintiff moves for summary judgment of a single issue: whether Sachs is liable under Plaintiff's first cause of action, i.e. whether Sachs is liable for failure to pay for all "hours worked." *See* Plaintiff's Memorandum at 1, ECF 57-1; Plaintiff's Renotice of Motion, ECF 85. Defendants' alleged failure to pay for meal and rest periods is no longer part of this case. *See* Order Granting Motions to Strike Portions of the Consolidated Complaint, ECF 86; *see also* Section I *supra*.

Plaintiff's "hours worked" claim divides into two parts. First, the time spent between the Security Gate and employee parking lot and, second, the time spent on the buggy ride between the parking lot and worksite. Plaintiff's "buggy ride" time—Plaintiff's travel time between the parking lot and the solar panel work zone—is not in reasonable dispute. Sachs states that "Plaintiff was paid beginning at the point where he boarded the buggy." Sachs's Motion at 6,

ECF 40.  Indeed, Plaintiff acknowledged that "8:00 [a.m.] is my starting time . . . . [when we would] jump in the buggies."  *See* Griffin Depo. at 30:1–20.  Moreover, Sachs presents sworn testimony from its Vice President that "[e]mployees are paid beginning at the point when they board the buggy."  Rega Decl. ¶¶ 1, 4.  Plaintiff presents no evidence to the contrary, but instead testimony that some workers heard Sachs management say the work day "is supposed to begin" after the buggy ride.  *See* Plaintiff's Opp'n at 2 n.1, ECF 54 (citing Jimenez Decl. ¶ 67; Bundren Decl. ¶ 66); *see also* Plaintiff's References to the Record at 2, ECF 105.  Ms. Maria Jimenez (a former Sachs employee) testified that she heard Sachs management say "that the start time for the 8 hour work day began either when the buggies got to [the] morning meeting site or to the work site."  Jimenez Decl. ¶ 67.  Ms. Jimenez claims that "[a]s a result, [unnamed] workers were not paid for the buggy ride."  *See id.*  This is mere speculation that the Court does not credit as evidence.  None of Plaintiff's witnesses has submitted evidence showing that they did not receive pay for the buggy ride.  Plaintiff fails to name even a single worker who was allegedly not paid for the buggy ride, and Plaintiff submits no paystubs or other evidence in support.  In sum, the Court finds no genuine dispute of material fact as to whether workers were paid for travel time on the buggies from the parking lots to the solar panel work zones.  Therefore, the only travel time in question is Plaintiff's travel time on the Access Road from the Security Gate to Plaintiff's assigned parking lot.  *See* Consol. Compl. ¶¶ 24–43, ECF 51.

Sachs moves[4] for summary judgment of three issues: (1) whether Sachs is liable under Plaintiff's first cause of action; (2) whether Plaintiff's remaining class claims against Sachs fail as a matter of law because they are entirely derivative of Plaintiff's first cause of action; and (3) whether Sachs had legitimate and non-discriminatory grounds to terminate Plaintiff such that Sachs is not liable under Plaintiff's individual claims.  *See* Sachs's Motion at 2, ECF 40; Sachs's Renotice of Motion, ECF 89.

Accordingly, the parties' motions are cross-motions with respect to whether the Sachs is liable for failure to compensate Plaintiff for his travel time on the Access Road.  The Court first

---

[4] McCarthy did not join in Sachs's motion for summary judgment and at this time McCarthy has not separately moved for summary judgment.

jointly addresses the travel time issue, followed by Sachs's request for summary judgment as to the remaining class claims, and lastly Sachs's request for summary judgment as to Plaintiff's individual claims. As discussed below, Sachs's motion for summary judgment is GRANTED and Plaintiff's motion for partial summary judgment is DENIED.

### A. Travel Time on the Access Road

Sachs contends that "Plaintiff controlled how he got to work" and that Plaintiff's travel between the Security Gate and the parking lot is a type of "ordinary commute" that "California law makes clear . . . is not compensable." *See* Sachs's Motion at 8; Sachs's Opp'n at 6, ECF 63. More specifically, Sachs contends that Plaintiff's travel time is not compensable because "Defendants did not exert control over Plaintiff during the drive and the workday had not otherwise already begun." *See* Sachs's Motion at 15; Sachs's Opp'n at 13. Plaintiff counters that Sachs is required to compensate workers for travel time on the Access Road for two independent reasons: (1) that under California law, travel time on the Access Road constitutes "hours worked" because workers are under Sachs's "control"; and (2) that the Security Gate was "the first location where the employee's presence" was required under California IWC Order 16-2001 making subsequent travel on the Access Road "employer-mandated travel." *See* Plaintiff's Opp'n at 16, 20; *see also* Plaintiff's Memorandum at 16, 20. The Court addresses the following in turn: (1) background principles concerning "hours worked" under California law; (2) Plaintiff's "hours worked" due to "control" argument; (3) Plaintiff's "first location where the employee's presence was required" argument; and (4) a brief conclusion.

### 1. "Hours Worked" Principles under California Law

The Industrial Welfare Commission ("IWC") is "the state agency empowered to formulate regulations (known as wage orders) governing employment in the State of California." *Tidewater Marine Western, Inc. v. Bradshaw*, 14 Cal. 4th 557, 576 (1996) (citing Cal. Lab. Code §§ 1173, 1178.5, 1182). IWC has promulgated at least 16 wage orders pertaining to specific industries and specific occupations. Wage Order No. 16-2001 ("Wage Order 16") applies to all persons employed in the on-site occupations of construction, drilling, logging, and mining, subject to exceptions not relevant here. *See generally* Wage Order 16, Cal. Code Regs. tit. 8, § 11160.

Plaintiff brings the instant action under Wage Order 16. *See, e.g.*, Consol. Compl. ¶ 29.

All 16 wage orders contain the same definition of "hours worked" as does Wage Order 16 (except for Wage Orders 4 and 5 which include additional industry-specific language). Thus consistent with its fellow wage orders, Wage Order 16 provides:

> "Hours worked" means the time during which an employee is subject **to the control of an employer**, and includes all the time the employee is suffered or permitted to work, whether or not required to do so.

Wage Order 16 ¶ (2)(J) (emphasis added). Multiple courts have analyzed whether certain job-related activities constitute "hours worked" under the IWC's wage orders. The following discussion is representative.

An employee who is subject to an employer's control is not required to be working during that time to be compensated under the IWC's wage orders. *See Bono Enterprises, Inc. v. Bradshaw*, 32 Cal. App. 4th 968, 974–75 (Ct. App. 1995), *disapproved of on other grounds by Tidewater*, 14 Cal. 4th at 573–74. In *Bono*, the California Court of Appeal found that employees in the manufacturing industry who were required to remain on the work premises during their lunch hour had to be compensated for that time under the definition of "hours worked" in Wage Order 1. *See* 32 Cal. App. 4th at 979. The *Bono* court held that "[w]hen an employer directs, commands or restrains an employee from leaving the work place during his or her lunch hour and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control." *Id.* at 975. Likewise, in *Aguilar v. Ass'n for Retarded Citizens*, 234 Cal. App. 3d 21 (Ct. App. 1991), the Court of Appeal found that employees who were required to be on the employer's premises and on call but were allowed to sleep were "subject to the control of [the] employer" under Wage Order 5 regardless of whether the employees were sleeping or working during the time in question. *Id.* at 23, 30–31.

The type of time in question in the instant action is not the "lunch time" in *Bono* or the "sleep time" in *Aguilar* but instead travel time. "California law governs an employee's wage entitlement for transportation and provides a rule for distinguishing 'compulsory travel time' from 'an ordinary commute.'" *McMaster v. Coca-Cola Bottling Co.*, 392 F. Supp. 2d 1107, 1114 (N.D. Cal. 2005) (citing *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 579 n.2 (2000)). "The inquiry

into 'compulsory travel time' turns on the level of control exerted by an employer over the employee, considering factual questions such as what activities an employee cannot engage in **by traveling in company transportation**." *McMaster*, 392 F. Supp. 2d at 1114 (quoting and citing *Morillion*, 22 Cal. 4th at 586–87) (emphasis added). The California Supreme Court has made clear that such "compulsory travel time" constitutes "hours worked" under the IWC's wage orders entitling employees to compensation. *See Morillion*, 22 Cal. 4th at 587 ("Interpreting the plain language of 'hours worked,' [] we find that plaintiffs' compulsory travel time . . . was compensable [under Wage Order 14].").

In *Morillion*, defendant Royal Packing Co. required its agricultural employees (the plaintiffs) to meet for work each day at specified parking lots or assembly areas—i.e. "departure points." *See* 22 Cal. 4th at 579. The employees were not permitted to use their own transportation to get to and from the departure points to the fields where they actually worked. *Id.* Instead, employees were required to "me[e]t at these departure points, [from where] Royal transported [the employees] in buses that Royal provided and paid for[] to the fields . . . [and from the fields] back to the departure points on its buses [at the end of each day]." *See id.* In deciding whether the employees' travel time on Royal's buses from the departure points to the fields and back again constituted "hours worked," the California Supreme Court instructed that "[t]he level of the employer's control over its employees, rather than the mere fact that the employer requires the employees' activity, is determinative." *See id.* at 587.

Crucial to this inquiry is what travel options are available to the employees. The *Morillion* court explained that "[if] commuting on their own, employees may choose and may be able to run errands before work and to leave from work early for personal appointments. *See id.* at 587. By contrast, "Royal required plaintiffs to meet at the departure points at a certain time to ride its buses to work, and it prohibited them from using their own cars, subjecting them to verbal warnings and lost wages if they did so." *Id.* Thus, "by directing and commanding plaintiffs to travel between the designated departure points and the fields on its buses, Royal 'controlled' them within the meaning of 'hours worked' under [Wage Order 14]." *See id.* (internal quotations and citation omitted). *Morillion* accordingly held that "[w]hen an employer requires its employees to meet at

designated places to take its buses to work and prohibits them from taking their own transportation, these employees are 'subject to the control of an employer,' and their time spent traveling on the buses is compensable as 'hours worked.'" *Id.* The court noted that "this compulsory travel time does not include the time plaintiffs spent commuting from home to the departure points and from the departure points back again." *See id.* at 579 n.2.

Morillion has since been applied in at least two "travel time" cases relied on by Plaintiff and Sachs: *Overton v. Walt Disney Co.*, 136 Cal. App. 4th 263 (Ct. App. 2006), and *Burnside v. Kiewit Pacific Corp.*, 491 F.3d 1053 (9th Cir. 2007). The Court discusses each in turn.

In *Overton*, plaintiff (a Disneyland employee) was assigned parking in a lot one mile from the employee entrance to Disneyland. 136 Cal. App. 4th at 265. Disney provided a shuttle from this lot to the employee entrance. *Id.* Plaintiff brought a proposed class action on behalf of all Disney employees who parked in this "satellite" lot, seeking compensation for their travel time on the Disney-provided shuttle. *Id.* However, Disney employees were not required to drive to work and were not required to take the shuttle. *See id.* Instead, employees assigned to the lot had the option of not using the lot whatsoever (e.g., traveling to work by bus or getting dropped off directly outside the employee entrance), or parking in the lot but not taking the shuttle (e.g., walking or bicycling from the lot to the employee entrance). *See id.* at 267–68. On these undisputed facts, the California Court of Appeal affirmed the trial court's finding that *Morillion* did not apply, and the trial court's grant of summary judgment in favor of Disney. *See Overton*, 136 Cal. App. 4th at 265, 268. The *Overton* court reasoned that under *Morillion*, "the key factor is whether Disney ***required*** its employees who were assigned parking in the [] lot to park there and take the shuttle." *Overton*, 136 Cal. App. 4th at 271 (emphasis in original). Because Disney "obviously did not" have such a requirement and employees could bypass the lot and/or shuttle altogether, the *Overton* court held that Disney did not exercise the requisite level of control over employees riding the shuttle to convert the time into "hours worked." *See id.* at 270–71.

In *Burnside*, plaintiffs were industrial workers who alleged defendant Kiewit Pacific Corp. "never compensated [them] for time they spent traveling from designated meeting sites to their jobsites and from those jobsites back to the [] meeting sites." 491 F.3d at 1055. At the designated

14

meeting sites Kiewit's managers would instruct the workers "on the day's tasks" and had them "retrieve equipment and plans for use" on Kiewit's projects. *See id.* at 1056. After the meetings concluded, the workers traveled in company vans or trucks—frequently operated by the employees themselves—to their jobsites. *Id.* Plaintiff Burnside estimated that the combined meeting and travel times "added two to two-and-one-half hours of work to each employee's day." *Id.* Plaintiffs' claims were brought under California state law, including alleged violations of Wage Order 16. *See id.* at 1055, 1058. The primary issue faced by the Ninth Circuit on appeal was "[w]hether the employees' claims, brought under state law, [were] preempted by section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a)." *Id.* at 1055. The Ninth Circuit held "that Burnside's claims are not preempted by section 301 and may go forward under state law because (1) the right to be compensated for employer-mandated travel time is a right conferred by state law, independent of the CBAs; and (2) the matter at hand can be resolved without interpreting the CBAs." *Id.* at 1058.

Although not explicitly faced with the question of whether Burnside's travel time constituted "hours worked" under Wage Order 16, the Ninth Circuit noted that "[t]he facts of *Morillon* are entirely reminiscent of the facts alleged in the [Burnside] complaint." *See Burnside*, 491 F.3d at 1061. The court explained that Kiewit's requirements were "[l]ike [] the defendant['s] in *Morillon*, [who] required its employees, who were agricultural workers, 'to meet for work each day at specified parking lots or assembly areas' and 'prohibited [them] from using their own transportation to get to and from the fields.'" *Burnside*, 491 F.3d at 1061 (citing and quoting *Morillon*, 22 Cal. 4th at 579). The Ninth Circuit reiterated *Morillon*'s ruling "that '[t]ime employees spend traveling on transportation that an employer provides but does not require its employees to use may not be compensable as hours worked.'" *Burnside*, 491 F.3d at 1062 (citing and quoting *Morillon*, 22 Cal. 4th at 588). The Ninth Circuit further reasoned that "Wage Order 16-2001 requires payment for travel time only when the employer ***mandates*** use of its transportation." *Burnside*, 491 F.3d at 1072 (emphasis in original).

//

//

### 2. Plaintiff's Travel Time on the Access Road was not "Hours Worked" under California Law

As an initial matter, the Court notes that Sachs discusses federal law, the Fair Labor Standards Act ("FLSA"), and the Portal-to-Portal Act of 1947 at length in its opening brief. *See, e.g.*, Sachs's Motion at 10–14, ECF 40. Plaintiff responds that "federal law has no application to Plaintiff's state law claims." *See* Plaintiff's Opp'n at 23, ECF 54. The Court agrees that federal law is not applicable here. As articulated by the California Supreme Court in *Morillon*, "the relevant portions of the FLSA and Portal-to-Portal Act differ substantially from [the IWC's] [w]age [o]rder[s] [] and related state authority." 22 Cal. 4th at 594. Therefore, "federal law should be given no deference in interpreting California wage orders" because "that federal labor law differs substantially from state law." *See Overton*, 136 Cal. App. 4th at 270 (citing *Morillon*, 22 Cal. 4th at 588). Accordingly, the Court does not credit or address Sachs's arguments made under federal law.

Turning to California law, Sachs argues that Plaintiff's travel time on the Access Road "is not compensable because it is a continuation of an ordinary commute that started at Plaintiff's home and ends at the parking lot where Plaintiff began getting paid." *See* Sachs's Motion at 9 (citing *Morillon*, 22 Cal. 4th at 575, 579 n.2). Sachs contends that under California law it did not exercise the requisite control over Plaintiff because "Sachs did not require [Plaintiff] to take any particular mode of transportation to get to work," but instead "Plaintiff controlled how he got to work." *See id.* at 8. Plaintiff counters that "[o]nce [Plaintiff] arrived at the Security Gate [] and thereafter, [Plaintiff] w[as] clearly under Sachs's control and could not effectively use such time for [his] own purposes." Plaintiff's Opp'n at 17. Plaintiff further argues that "[t]he control exercised by Sachs over its workers is essentially the same as that exercised by the employer in *Morillon*." *Id.* Thus, both parties rely on *Morillon* in support of their respective positions. For the reasons discussed below, the Court finds that Plaintiff's travel time on the Access Road does not constitute "hours worked" under California law.

From a factual standpoint, none of the three travel time cases raised by the parties is directly on point. *Morillon* and *Burnside* both concerned employer-mandated travel on employer-provided transportation from a parking lot or meeting point to the respective work zones. In

*Morillion*, the agricultural workers were required to ride the employer's buses from the departure points (parking lots or assembly areas) to the fields and back again. 22 Cal. 4th at 579. In *Burnside*, the industrial workers were likewise required to utilize the employer's vehicles for roundtrip travel between designated meeting sites and their jobsites. 491 F.3d at 1055. In other words, the employees in *Morillion* and *Burnside* had no choice but to use employer-provided transportation—they were "prohibited [] from using their own transportation," *Morillion*, 22 Cal. 4th at 579. On these facts, the *Morillion* court found that the employer "controlled" the employees within the meaning of "hours worked" under Wage Order 14. *Id.* at 587.

Here, by contrast, Plaintiff and his fellow workers were not required to use employer-provided transportation to travel on the Access Road from the Security Gate to the parking lots. Far from it. Workers could choose means of travel on the Access Road from a variety of options—to drive alone in their own vehicle, carpool with other workers, take a bus offered by McCarthy from locations throughout a multi-county area, or take transportation offered by Sachs if a worker was dropped off at the Security Gate. *See* Rega Decl. ¶ 3, ECF 40-5; Griffin Depo. at 23:12–22, 40:13–22, ECF 50-2; Wilkinson Depo. at 39:15–20, ECF 101-1. Thus, *Morillion*'s holding that employees are "subject to the control of an employer" where "an employer requires its employees to meet at designated places to take its buses to work and prohibits them from taking their own transportation" is not controlling with respect to Plaintiff's travel time on the Access Road. *See Morillion*, 22 Cal. 4th at 587. Instead, the facts of *Morillion* and *Burnside* are more akin to Plaintiff's travel by buggy from his assigned parking lot to the solar panel work zone— travel that is employer-mandated and Plaintiff's sole option. *See* Rega Decl. ¶ 3; Griffin Depo. at 31:6–10. However, Plaintiff's compensation for travel time by buggy is not in meaningful dispute.

On the other hand, the controlling facts in *Overton* do not sufficiently map on to the facts here to allow direct application of the *Overton* holding in this case. In *Overton*, employees traveling from the parking lot to the worksite were not required to ride the employer-provided shuttle between the two locations. 136 Cal. App. 4th at 270–71. Instead, employees could bypass the lot and/or shuttle altogether, by walking or bicycling from the lot to the worksite or by arriving

17

directly to the worksite by other means. *See id.* at 267–68. Here, Plaintiff was required to actually travel on the Access Road to reach the solar panel work zone, unlike the employees in *Overton* who could arrive to the worksite without spending any time whatsoever on the route in question. In other words, the employees in *Overton* were not actually required to travel between the parking lot and the worksite. *See id.* Thus, *Overton*'s holding that Disney did not "control" employees riding the shuttle within the meaning of "hours worked" fails to compel the same outcome here. *See id.* at 270–71.

Likewise, *Burnside* is not a particularly good fit either. In discussing whether the *Burnside* employees' claims under state law were preempted by federal law, the Ninth Circuit stated that "Wage Order 16-2001 requires payment for travel time only when the employer **mandates** use of its transportation." *Burnside*, 491 F.3d at 1072 (emphasis in original). This articulation appears slightly more stringent than *Morillion*'s ruling that "[t]ime employees spend traveling on transportation that an employer provides but does not require its employees to use may not be compensable as hours worked." *Morillion*, 22 Cal. 4th at 588. However, *Burnside* focused on preemption and did not make an "hours worked" or "control" determination under the IWC's wage orders, notwithstanding *Burnside*'s recognition that "[t]he facts of *Morillion* are entirely reminiscent of the facts alleged in the instant complaint." *Burnside*, 491 F.3d at 1055, 1061. Thus, the Court does not read *Morillion* as stringently—to necessarily foreclose compensation for travel time under Wage Order 16 if the employer did not literally mandate use of its own transportation. Put differently, the "control" analysis is more nuanced—an employer is not off the hook simply because employees could ride a non-employer-provided vehicle. Indeed, *Morillion* instructs that "by requiring employees to take **certain transportation** to a work site, employers thereby subject those employees to its control **by determining when, where, and how they are to travel**." 22 Cal. 4th at 588 (emphasis added). Moreover, in *Rutti v. Lojack Corp.*, 596 F.3d 1046 (9th Cir. 2010), the Ninth Circuit clarified its position, noting that under *Morillion* "the level [of] control" is determinative. *See Rutti*, 596 F.3d at 1062. Accordingly, although whether mandatory travel on employer-provided transportation is "the key factor," *see Overton*, 136 Cal. App. 4th at 271, the Court will also consider other aspects of Sachs's purported "control" over

18

Plaintiff's travel time on the Access Road.

With these cases in mind, the Court considers the arguments raised by the parties. The parties' briefing generally concerns two types of rules: (1) rules specific to the Access Road; and (2) general workplace rules that applied to Plaintiff's travel on the Access Road. *See, e.g.*, Sachs's Motion at 15–18, 19–20; Plaintiff's Opp'n at 4–8, 9–14. Thus, the Court's discussion proceeds as follows: (1) Plaintiff's mode of transportation and whether Sachs's rules of the Access Road equate to control within the meaning of "hours worked"; (2) whether Sachs's general workplace rules as applied to travel on the Access Road equate to control; and (3) whether the combined rules—i.e., a totality of the circumstances—equate to control. Each of the three issues is discussed in turn. For the reasons stated below, whether taken one by one or viewed as a whole, the Court finds that Sachs's rules of the Access Road and workplace rules that applied to Plaintiff's travel on the Access Road did not subject Plaintiff "to the control of [the] employer" within the meaning of "hours worked" under Wage Order 16.

### a. Plaintiff's Mode of Transportation and Sachs's Rules of the Access Road

Sachs contends that Plaintiff was "not require[d] [] to take any particular mode of transportation to get to [the parking lot]" and that under California law employees are not entitled to compensation where they "have a choice about [how to] commute to work." *See* Sachs's Motion at 8–9; *see also* Sachs's Opp'n at 7. In other words, Sachs argues that California law does not require an employer to compensate an employee for travel time "where [the] employee drove his or her own vehicle to work directly from home." *See* Sachs's Motion at 9. Plaintiff counters that Sachs's requirement that "workers [] use a specific route on private land after passing through [] a specific security gate into a project site surrounded by fences and exercising stringent control over the employees' activities on route to the daily work areas is no different than requiring workers to use a bus to travel to a work area as in *Morillion*." *See* Plaintiff's Opp'n at 17. The Court disagrees with Plaintiff. As previously discussed, the travel time in *Morillion* found to constitute "hours worked" was between specified parking lots or assembly areas (i.e. departure points) and the fields where the employees worked. 22 Cal. 4th at 579. *Morillion* made clear that "this compulsory travel time does not include the time plaintiffs spent commuting from home to

the departure points and from the departure points back again." *See id.* at 579 n.2. Here, Plaintiff's travel on the Access Road is more analogous to the *Morillion* employees' travel "from home to the departure points" than "[from the departure points] to the fields where plaintiffs actually worked." *See id.* at 575, 579 n.2.

Indeed, the California Supreme Court admonished that *Morillion* "should not be construed as holding that all travel time to and from work" is compensable. 22 Cal. 4th at 587. In other words, the mere fact that Plaintiff's only pathway to his departure point (the specified parking lot at which Plaintiff would board a buggy and travel to the solar panel work zone) was via the Access Road is not determinative. *See id.* Such a requirement is no different than mandating that an employee who works in an isolated building on a private campus use a single accessway to that building. As Sachs points out, *see* Sachs's Motion at 10–11, travel on an employer's premises to find a parking space or walk to an elevator or certain department is generally not compensable. In the "isolated building" example, and in the instant action, the employer requires the employee to use the single accessway, but it is "[t]he level of the employer's control over its employees, rather than the mere fact that the employer requires the employees' activity, [that] is determinative." *See id.* at 587.

Thus, the question at hand turns on the level of control Sachs exercised over Plaintiff on the Access Road. *See Morillion*, 22 Cal. 4th at 586–87. Crucial to this inquiry is what travel options are available to the employees. The "key factor" is whether Sachs imposed mandatory travel on employer-provided transportation. *See Overton*, 136 Cal. App. 4th at 271. Sachs imposed no such requirement—workers could traverse the Access Road in their own vehicles, carpool with other workers, ride a bus offered by McCarthy from locations throughout a multi-county area, or take transportation offered by Sachs from the Security Gate to the parking lots. *See* Rega Decl. ¶ 3, ECF 40-5; Griffin Depo. at 23:12–22, 40:13–22, 52:12–53:7, ECF 50-2; Wilkinson Depo. at 39:15–20, ECF 101-1. Thus, the workers were neither literally required nor effectively required to make use of employer-provided transportation to travel on the Access Road from the Security Gate to the parking lots. Case in point, Plaintiff drove his own car from the Security Gate to his assigned parking lot on some days, while on other days Plaintiff was a carpool

passenger with other workers. Griffin Depo. at 23:12–22, 40:13–22. This cuts against "control."

Plaintiff argues that nonetheless, "Sachs workers had no ability to run errands once they passed through the Security Gate" and that after passing through the Security Gate "they were not free to use the time effectively for their own purposes." *See* Plaintiff's Opp'n at 18. Sachs responds that Plaintiff's argument is not salient because no employee in any work context driving her own vehicle could run errands while "traveling on the employer's premises before work." *See* Sachs's Reply at 9. In other words, Sachs argues that "[t]he fact that Plaintiff could no longer run an errand while on the Project [site] does not speak to the level of control." *See id.* The Court agrees with Sachs that Plaintiff's argument misses the essential point. The *Morillion* court explained that "[if] commuting on their own, employees may choose and may be able to run errands before work and to leave from work early for personal appointments." 22 Cal. 4th at 587. Here, Plaintiff was free to arrange his own commute in a manner that best suited his ability to run errands or attend personal appointments before or after work—he simply could not engage in such personal tasks leading up to entry and immediately following exit from the parking lot because there were no services or stores available on that twelve-mile stretch. In a sense, the Access Road is no different than the long stretches of Central Valley roads that have absolutely no services, stores, or rest areas. And, Plaintiff was not prohibited from stopping at any dry cleaner or pharmacy on his commute. Although Plaintiff was required to travel up and down the Access Road before conducting a given personal errand or activity, Plaintiff nonetheless had discretion to drive his own vehicle, ride with others, ride a McCarthy-provided bus, or make other arrangements to be picked up or dropped off at the Security Gate before or after work. In other words, "[b]y commuting on [his] own," *see Morillion*, 22 Cal. 4th at 587, Plaintiff retained the ability to arrange his commute to suit his personal preferences, irrespective of the conditions imposed by Sachs (and the State of California) once on the Access Road.

Indeed, in its discussion finding that federal authority should be given no deference, the *Morillion* court still distinguished a federal opinion that had found travel time not compensable. 22 Cal. 4th at 589 n.5 (distinguishing *Vega v. Gasper*, 36 F.3d 417 (5th Cir. 1994)). In doing so, the *Morillion* court explained that "we find the fact that the *Vega* employees were free to choose—

rather than required—to ride their employer's buses to and from work, a dispositive, distinguishing fact." 22 Cal. 4th at 589 n.5. Thus, *Morillion* makes clear that an employee's freedom to "cho[o]se . . . how to get to and from work" strongly indicates the absence of "control" within the meaning of "hours worked" under the wage orders. *See id.* The same principle applies where a Sachs worker permissibly started work late or permissibly left work early. By commuting on their own, workers could arrange to arrive at the parking lot later than normal or leave from the parking lot earlier than normal[5] without relying on employer-provided transportation, thus exercising options available by virtue of driving their own vehicles to work. *Cf. Morillion*, 22 Cal. 4th at 587 ("Royal required plaintiffs to meet at the departure points at a certain time to ride its buses to work, and it **prohibited them from using their own cars**.") (emphasis added).

Moreover, as pointed out by Sachs, *see* Sachs's Reply at 6, ECF 72, the California Supreme Court recently rejected the *de minimis* doctrine found in the Fair Labor Standards Act ("FLSA"), *see Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 835 (2018). This implies that the length of time spent by the employee in the conduct at issue—whether relatively short or relatively long—is not relevant to the analysis of whether the time constitutes "compensable work," *see id.* at 847. Here, as to be expected, neither party argues that the length of time in transit is determinative. Accordingly, the Court does not factor in the length of Plaintiff's commute on the Access Road—about 50 minutes each way, *see* Rega Decl. ¶ 3; Griffin Decl. ¶ 8—in analyzing "control," but rather whether Sachs exercised the requisite level of control over the travel time in question by virtue of the applicable rules.

While driving his vehicle or carpooling with other workers Plaintiff was subject to the rules of the Access Road. Sachs contends that these rules—e.g., "[f]ollowing a posted speed limit, not interfering with animals [], not bringing visitors, and not smoking"—did "not divert Plaintiff in any way from reaching the parking lot." *See* Sachs's Motion at 19. Sachs further contends that "each rule is analogous to ordinary rules on virtually every employer's premises that employees must respect at all times, even when not getting paid." *Id.* The Court agrees. The rules of the

---

[5] Plaintiff signed on to Sachs's "Standard Job Work Rules," which contemplate situations in which workers "are late or need to leave early." *See* Ex. 1 to Griffin Decl., ECF 50-2.

Access Road are fundamentally no different than limitations imposed on travel through other types of premises where employees first pass through a security gate and drive to a parking lot before proceeding to their actual worksite or building. In addition, as pointed out by Sachs, *see id.* at 19–20, the State of California, not Sachs, originated many of the restrictions. For example, "vehicle speeds [could] not exceed 20 miles per hour to avoid Covered Species on or traversing the roads," *see* ITP § 6.13, Ex. A to Rega Decl., ECF 40-5, and the speed limit was further restricted to 5 miles per hour in certain kit fox zones, *see* Rega Decl. ¶ 8, ECF 40-5. In the same vein, employees were not permitted to cross Covered Species' habitat and were restricted to existing or project-approved travel routes. *See* ITP § 6.13. These rules of the road stem from requirements of the California Endangered Species Act, articulated by the California Department of Fish and Wildlife, not Sachs. *See* Rega Decl. ¶ 5; *see generally* ITP. And while "[t]here was no possible way to walk or ride a bicycle from the Security Gate . . . to the parking lot," *see* Griffin Decl. ¶ 9, ECF 50-2, this was an inherent feature of the Project site rather than an independent direction or command imposed by Sachs on its employees.

Sachs further argues that "a rule that employees must drive safely and not exceed a certain speed while driving on the employer's property at all times, even when not getting paid, is [] commonsense." Sachs's Motion at 20 (emphasis removed). Indeed, low speed limits or restricted access zones are not atypical on an employer's premises. A daycare or school with children present may require extremely low vehicle speeds, limit vehicle traffic to a specific roadway, and/or restrict cell phone use. Similar restrictions apply to numerous premises where workers drive for some distance on to an employer's property to park. The Court is unpersuaded that such safety precautions convert travel time into "hours worked" under the IWC's wage orders and *Morillion*. The same goes for Sachs's rules that workers could not pass other vehicles (except when a car had broken down or pulled over), could not drive "in a way that created a lot of dust," could not smoke on the Access Road in or out of their vehicles, were required to report accidents, and the like. *See* Griffin Decl. ¶¶ 39, 40, 45, 51, 53; *see also* Plaintiff's Opp'n at 9–13. The Court agrees with Sachs, *see* Sachs's Motion at 4, 16–17, that these restrictions are safety-oriented in nature and are not fundamentally different from restrictions inherent to travel from the security

gate of a compound or campus to the parking lot. Likewise, Sachs's rules that workers "were not supposed to touch or feed anything to the local wildlife or cattle [] along the [] Access Road" or play "loud music" that would disturb the animals, *see* Plaintiff's Opp'n at 11–12 (citing Griffin Decl. ¶¶ 48, 50), are a type of universal rules common to general travel on an employer's premises. The same reasoning applies to Sachs's rule that workers were not permitted to be on the Project site between sunset and sunrise, *see* Griffin Decl. ¶¶ 16, 17.

In fact, Plaintiff goes so far as to argue that Sachs "controlled" its workers under Wage Order 16 based in part on Sachs's rule that workers "could not stop and get out of their vehicles to relieve themselves at any location along the [] Access Road other than at [the provided] portable toilet sites." *See* Plaintiff's Opp'n at 13 (citing Griffin Decl. ¶ 59). This is absurd and nowhere near the requisite level of control. Such behavior could be considered lewd, indecent, or possibly disorderly conduct. To suggest that Sachs is required to compensate its workers for travel time on the Access Road based in part on Sachs's extremely proper and reasonable rule that workers could not urinate freely wherever they wished is simply preposterous.

### b. Sachs's General Workplace Rules as applied to Travel on the Access Road

The Court next turns to Sachs's general workplace rules. Sachs contends that all travel on an employer's premises before/after work "entails some level of control," and that an employee is not entitled to compensation simply because she "must obey many rules while on the premises." *See* Sachs's Motion at 15. Sachs argues that employers may generally enforce such rules as "no smoking, no littering, no loitering, no talking to customers, no carrying weapons, no eating or drinking, no sleeping, no pets, and no disruptive noises" over employees traveling on the property before/after work without giving rise to compensable travel time. *See id.* at 15, 16. Plaintiff counters that Sachs's rules were "strict," and that Sachs's rules constituted "substantial control" in a variety of ways. *See* Plaintiff's Memorandum at 1–2, ECF 57-1; Plaintiff's Opp'n at 6–9 (reciting Sachs's workplace rules). As discussed below, the Court finds that Sachs's general workplace rules that applied to Plaintiff's travel on the Access Road did not subject Plaintiff "to the control" by Sachs within the meaning of "hours worked" under Wage Order 16.

First, Plaintiff argues that "workers were [] under Sachs's control" at the beginning and

24

end of the workday because they were required to badge-in and badge-out at the Security Gate. *See* Plaintiff's Opp'n at 17–18.  In support, Plaintiff cites *Cervantez v. Celestica Corp.*, 618 F. Supp. 2d 1208, 1216 (C.D. Cal. 2009) for the proposition that "time spent going through security screening constitute[s] hours worked under California law."  *See* Plaintiff's Opp'n at 17.  Sachs responds that *Cervantez* involved a "[physical] search" that required employees to "proceed to a certain area" that is "wholly absent in [the instant action]."  *See* Sachs's Reply at 12.  The Court agrees that *Cervantez* is inapposite.  In *Cervantez*, the security screening at issue was "akin to screenings at an airport" to which all employees had to submit.  *See Frlekin v. Apple Inc.*, 2015 WL 6851424, at *6 (N.D. Cal. Nov. 7, 2015) (citing *Cervantez*, 618 F. Supp. 2d at 1216). Here, by contrast, personnel at the Security Gate did not screen employees or their belongings in such a manner.  Instead, workers traveling by car presented their badges at the guard shack to gain entry through the Security Gate.  *See* Griffin Depo. at 34:11–24.  Whether driving or riding, workers were not required to exit the car, but simply held up their badges for scanning by the person(s) staffing the guard shack. *See id.* at 37:1–16; 40:13–22; 42:23–43:14.  This process is analogous to scanning or flashing an employee badge to enter a compound or campus, and unlike the airport-like screening in *Cervantez* that applied to all employees.  Accordingly, Plaintiff's time spent badging-in and badging-out at the Security Gate does not equate to control.

Plaintiff further argues the security setup required him at times "to sit in [his] vehicle[] in a line outside the Security Gate [] for approximately 10 to 20 minutes or more waiting for the sun to come up and for the Security Gate [] to be opened" and that "[t]he same kind of line and wait would almost always happen . . . at the end of the day."  *See* Plaintiff's Opp'n at 4 (citing Griffin Decl. ¶ 24).  Sachs counters that such time in line is the result of "[an] interaction [] strictly for the purposes of ingress and egress, and does not involve any interaction with the employer that is anywhere near the interaction during a bag check or other inspection."  *See* Sachs's Reply at 12. The Court finds that Plaintiff's wait time of approximately 10 to 20 minutes to get through the Security Gate due to congestion at the beginning and end of the day does not amount to control.  It is undisputed that Plaintiff and his fellow workers underwent no special screening or security check upon entry or exit.  Thus, Plaintiff's "wait time" is equivalent to a normal bottleneck

entering/exiting parking lots on an employer's premises around the time shifts begin/end and not an employer-controlled body screening. *Cf. Pelz v. Abercrombie and Fitch Stores, Inc.*, 2015 WL 12712298, at *1–2 (N.D. Cal. June 4, 2015) (denying defendant's motion for partial summary judgment where the waiting time at issue involved an actual bag check before the employees were permitted to leave). Nor is Sachs's rule that workers were required to carry their employee badge on their person from the time they entered the Security Gate to the time they exited, *see* Griffin Decl. ¶ 20, relevant here. Such a requirement is far too inconsequential to impact the Court's control analysis.

Second, Plaintiff argues that he was subject to additional general workplace rules while traveling on the Access Road that equate to control, including the following: "safety and personal protective equipment rules, discrimination rules, anti-harassment rules, environmental rules, alcohol and drug policies, rules related to being subject to searches for alcohol [and] drugs, no practical jokes, no horseplay rules, no gambling rules, no photography, [and] no loud music." *See* Griffin Decl. ¶ 32. Plaintiff also notes that no firearms were permitted on the Project site. *See* Plaintiff's Opp'n at 8; Jimenez Decl. ¶ 39, ECF 50-4. On the other hand, Sachs contends these rules are "common sense" restrictions akin to rules governing traveling to and from work in other highly regulated environments such as airports, zoos, and hospitals. *See* Sachs's Motion at 17. For example, Sachs argues that an airport gate agent is subject to "the complex and far-reaching rules of [the] airport" long before clocking in and starting work at a given location. *See id.* In addition, Sachs argues that its workplace rules are only "prohibitory," and thus did not mandate Plaintiff "to do anything," analogous to restrictions on virtually every employer's premises that employees must respect even when not getting paid. *See id.* at 18–19.

The Court agrees with Sachs that these general workplace rules are all prohibitory in nature and not fundamentally different from typical restrictions that apply on an employer's premises during travel from the parking lot to the workplace, with the possible exception of "safety and personal protective equipment rules" (which are addressed in the subsequent paragraph). In other words, these are standard prohibitions common to many work campuses or premises that reasonably foreclose activities that may be illegal or unsafe in that setting. It is illogical that an

employee would be subject to the control of her employer within the meaning of the IWC wage orders because she cannot gamble or possess firearms while commuting between the entrance to the campus and the parking lot. Put differently, these general workplace rules do not equate to control within the meaning of "hours worked" because they simply reflect standard workplace requirements not directed to "determining when, where, and how plaintiffs must travel," *see Morillion*, 22 Cal. 4th at 586.

With respect to "safety and personal protective equipment rules," Sachs acknowledges that "[a] rule . . . requiring employees to don protective gear before entering the plant at the start of a shift can certainly start the work day." *See* Sachs's Motion at 18. However, in opposing Plaintiff's motion for partial summary judgment, Sachs states that "workers did not have to wear PPE [personal protective equipment] in their cars." *See* Sachs's Opp'n at 21, ECF 63. Based on the evidence submitted by Plaintiff, the Court agrees. Plaintiff states that personal protective equipment "PPE" rules applied on the Project site, *see* Plaintiff's Memorandum at 6 (citing Griffin Decl. ¶ 32), but admits that the instruction around the Security Gate entrance was only a warning—"[b]e prepared to wear PPE [] beyond this point," *see* Plaintiff's Memorandum at 9 n.4 (citing and quoting Jimenez Decl. ¶ 39, among other declarations). The Court has reviewed the cited testimony and finds no evidence that workers were required to wear PPE during normal travel between the Security Gate and the parking lots. If anything, Plaintiff tacitly admits that no such requirement existed. In sum, the Court finds that no reasonable jury could infer that workers were required to wear PPE within cars or buses during daily roundtrip travel on the Access Road. Accordingly, the "safety and personal protective equipment rules" do not demonstrate control over Plaintiff's travel or initiate the workday at the Security Gate, and no genuine dispute of material fact exists as to any PPE requirement, *see Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009).

Third, Plaintiff argues that Plaintiff and his fellow workers "were not allowed to leave the premises [the Project site] from 7:00 a.m. to 5:30 p.m. without permission." *See* Plaintiff's Reply at 1, ECF 64. In a nutshell, as discussed at the Hearing, this boils down to whether an employee needed permission to leave the Access Road separate and apart from the permission required to leave work once the shift ended (i.e. after the buggy ride).

In support of his theory that workers needed separate permission to leave the Access Road, Plaintiff cites Sachs's "Standard Job Work Rules," which state "[t]he standard work day begins at 7:00 [a.m.] and ends at 5:30 [p.m.]." *See* Standard Job Work Rules § 6, Ex. 1 to Griffin Decl., ECF 50-2. At the Hearing, Plaintiff argued that the time period from 7:00 a.m. to 5:30 p.m. includes Plaintiff's "commute time" and therefore the restrictions of the "standard work day"— which include not leaving without permission—apply to Plaintiff's travel on the Access Road. *See* Hearing Tr. at 24:15–25:22; *see also* Standard Job Work Rules §§ 5, 6. Sachs counters that "the CBA sets forth a regularly recurring eight hour work day, starting after [Plaintiff's] [d]rive and ending before [Plaintiff's] [return] [d]rive." *See* Sachs's Reply at 14. In other words, Sachs argues that no individual employee's standard work day could have been 10.5 hours (7:00 a.m. to 5:30 p.m.), but rather eight hours as provided by the CBA. *See* Sachs's Motion at 22; Rega Decl. ¶ 12.

The Court agrees with Sachs that a given individual's standard work day was defined by the CBA, and thus not the 10.5 hours that Plaintiff claims. Plaintiff's testimony makes clear that his work day did not run from 7:00 a.m., but rather 8:00 a.m. *See* Griffin Depo. at 30:1–20 ("8:00 [a.m.] is my starting time . . . . [when we would] jump in the buggies and head off to work."). This is consistent with the CBA, which provides "[e]ight [] hours shall constitute a days work from 8:00 a.m. to 12:00 noon, and from 12:30 p.m. to 4:30 p.m. on Monday through Friday." *See* CBA § 3.01(a), Ex. D to Rega Decl., ECF 40-5. Although the Standard Job Work Rules generally define the "standard work day" as 7:00 a.m. to 5:30 p.m., they further specify that *individual* employees need only be "ready to work at their designated starting time, and shall remain at work until their regular quitting time." *See* Standard Job Work Rules § 6. These standard work times are set forth by the CBA. Accordingly, a given individual's work day did not encompass all 10.5 hours of the "standard work day" recited by the Standard Job Work Rules.

Plaintiff argues that nonetheless he was under Sachs's control on the Access Road because "[w]orkers were told that they were required to stay on the job site during the entire workday from the beginning of the workday to the end of the workday." *See* Plaintiff's Opp'n at 15 (citing Griffin Decl. ¶ 64). Although somewhat unclear, Plaintiff's theory appears to be that Sachs's use

of "job site" in this context meant "Project site" and that therefore Plaintiff could not leave the Access Road without permission under the Standard Job Work Rules, *see* Plaintiff's Reply at 1–2; Plaintiff's Opp'n at 14–15 (citing the Standard Job Work Rules). In any event, this theory is directly contradicted by the Standard Job Work Rules themselves, which define "Jobsite Access" in relation to commuting from a parking lot. *See* Standard Job Work Rules § 1. Thus, the "jobsite" under the Standard Job Work Rules is necessarily set off from the parking lot. This is consistent with the definition of "Work Area," which describes work-related activities in the "assigned work areas [or] workplace or jobsite" under the direction of a supervisor. *See* Standard Job Work Rules § 5. Plaintiff submits no evidence that supervisors were present or controlled or directed workers' travel on the Access Road. Accordingly, the rule that employees "may be subject to disciplinary action" for "leav[ing]" their assigned work areas [or] the workplace or jobsite without a supervisor's authorization" found in the Standard Job Work Rules, *see id.* § 5, does not apply to travel on the Access Road.

Next, Plaintiff argues that he was under Sachs's control while traveling on the Access Road because "[w]e were told [by Defendants] that it would a violation of the job site rules if we reach the Security Gate [] too early at the end of the workday and that we could be suspended or terminated if we violated that rule." Griffin Decl. ¶ 64; Plaintiff's Opp'n at 15. This is a version of Plaintiff's argument that workers "were not allowed to leave the premises [the Project site] [] without permission." *See* Plaintiff's Reply at 1. Here too, Sachs responds that no such permission was required to leave the Access Road. *See* Sachs's Reply at 13; Hearing Tr. at 37:4–9 (Sachs arguing that "there's no evidence that after their shift is over, [the employees] couldn't leave [or] proceed" to exit the Security Gate without ramification). Indeed, the evidence reveals no such requirement, but instead that permission to arrive to the assigned work place "late" or to "leave early" is defined in relation to the "assigned work place" itself, not travel on the Access Road. *See* Standard Job Work Rules § 6. In point of fact, Plaintiff acknowledged at the Hearing that "[t]here's no evidence" that employees lacked the authority to enter the Security Gate, travel halfway to the parking lot, and then turn around and leave. *See* Hearing Tr. at 24:23–25:8. Put differently, an employee could enter through the Security Gate, drive for a period of time in the

direction of the parking lot, realize that an urgent personal matter required her attention, turn around on the Access Road and depart through the Security Gate, and face discipline only if she failed to inform Sachs that she could not make it to her *assigned work place*.  I.e., the employee would not need to separately seek permission before turning around on the Access Road and exiting through the Security Gate.  *See* Hearing Tr. at 24:23–25:8.

Plaintiff submits declarations in support of his argument that workers could be terminated or disciplined for traveling on the Access Road "too early" after their shifts ended, *see* Plaintiff's Opp'n at 4; *see also* Plaintiff's References to the Record at 2–6 (citing and quoting Richmond Decl. ¶¶ 33, 34, 44; E. Manhart Decl. ¶¶ 17, 25, 34, 66; K. Manhart Decl. ¶¶ 19, 28, 69; Griffin Decl. ¶¶ 17, 26, 64; Jimenez Decl. ¶¶ 19, 27, 70; and Bundren Decl. ¶¶ 19, 28, 71), ECF 105.  However, the Court finds that these declarations are mere speculation on this topic, as Sachs argued at the Hearing.  *See, e.g.*, Hearing Tr. at 33:11–18; *see also* Sachs's Reply at 10–11.  As a representative example, the testimony is essentially that "Sachs and McCarthy would let guys leave the [parking] lot but then would terminate them for getting to the Security Gate [] too early."  *See* Richmond Decl. ¶ 44, ECF 50-7.  Yet, none of the six declarants alleges facing discipline or termination for arriving at the Security Gate "too early," and none of the six declarants names even a single worker who was subject to discipline or termination on these grounds.  The only declarant who makes even a remotely definitive statement is Mr. Richmond (a former Sachs wireman and foreman)—and Mr. Richmond relies on what an unnamed person told him had happened to unnamed workers.  *See* Richmond Decl. ¶ 44.  Although the Court reviews the evidence in the light most favorable to the non-moving party, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The law is clear that unsupported and conclusory claims are insufficient to stave off summary judgment.  *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (a nonmoving party "cannot defeat summary judgment with allegations in [its] complaint, or with unsupported conjecture or conclusory statements.").  Here, Plaintiff has submitted nothing beyond conjecture and speculation in support of his argument that workers

could be terminated for arriving at the Security Gate "too early" after shifts end.

In sum, the Court finds that Sachs's general workplace rules that applied to Plaintiff's travel time on the Access Road do not equate to control within the meaning of "hours worked" under Wage Order 16.

### c. Totality of the Circumstances

Finally, the Court considers the rules of the Access Road and the general workplace rules taken as a whole. In this action, Plaintiff was required to travel on a single accessway to his parking lot and abide by various rules of the road once on the premises, including reduced speed limits, limited or no cell phone use, and no loud music. *See supra* Section I.B. Plaintiff entered and exited the premises via a single Security Gate at which he was not required to leave his vehicle but was required to present his badge for scanning by security staff. *See id.* During travel, Plaintiff was also subject to general rules of the workplace, including anti-harassment rules, no photography, alcohol and drug policies, no firearms, and no smoking. *See id.* In addition, Plaintiff was not permitted to disturb local wildlife or cattle and was required to be off the premises between sunset and sunrise. *Id.*

Plaintiff argues that therefore he was "under the control of [Defendants] because of all of the job site rules to which [he] w[as] subjected" from the time "that Plaintiff entered the Security Gate [] in the morning until he exited the Security Gate [] at the end of the day." *See* Plaintiff's Memorandum at 6. Meanwhile, Sachs contends that "[t]he rules cited by Plaintiff do not 'control' him and entitle him to compensation [for his travel time on the Access Road]" because the rules amount only to "rules and a code of conduct" typical "[w]henever employees are on their employer's premises." *See* Sachs's Motion at 10. Sachs further contends that the instant action is unlike *Morillion* and *Rutti*, where "the level [was] total control," *see* Sachs's Reply at 10 (citing and quoting *Rutti v. Lojack Corp.*, 596 F.3d 1046, 1062 (9th Cir. 2010)).

The parties have cross-moved for summary judgment; i.e., the parties submit this issue to the Court for judgment as a matter of law. Considering the rules as a whole (as limited by the Court's preceding discussion), the result is no different than the Court's preceding individual analysis of the rules of the Access Road and the general workplace rules, respectively. At bottom,

Plaintiff was free on a daily basis to drive his own vehicle to work, carpool with other workers, ride an employer-provided bus to work from a multi-county area, or take employer-provided transportation from the Security Gate to the parking lot. By comparison, Plaintiff was not controlled to the extent the employer in *Rutti* curtailed its employee's rights by mandating "[use of] the company vehicle, [no] personal errands, [and no] passengers . . . from home to his job and back." 596 F.3d at 1061. Nor did the rules limit Plaintiff's rights during travel on the Access Road to the extent the employer in *Morillion* constrained its employees' rights by "directing and commanding . . . travel . . . on [the employer's] buses." 22 Cal. 4th at 587. That Plaintiff was required to travel at slow speeds and obey other rules of the Access Road while simultaneously abiding by Sachs's general workplace rules does not sufficiently distinguish Plaintiff's travel time on the Access Road from ordinary travel in a personal vehicle from a security entrance to a parking lot within any employer's secure campus or premises.

In conclusion, the Court finds no genuine dispute of material fact as to the level of control exercised by Sachs over Plaintiff's travel on the Access Road and that Plaintiff's travel time on the Access Road does not constitute "hours worked" under Wage Order 16 and California law.

### 3. The Security Gate was not "the first location where Plaintiff's presence was required" under Wage Order 16 ¶ 5(A)

Plaintiff separately argues that he is entitled to compensation for travel time on the Access Road because "Plaintiff's presence was required at the Security Gate" in a manner sufficient to trigger compensation under paragraph 5(A) of Wage Order 16. *See* Plaintiff's Opp'n at 20–21. On the other hand, Sachs contends that Plaintiff's "interaction [at the Security Gate] is too minimal" to constitute the required "presence" under Wage Order 16. For the reasons discussed below, the Court agrees with Sachs.

Paragraph 5(A) of Wage Order 16 provides:

> All employer-mandated travel that occurs **after the first location where the employee's presence is required** by the employer shall be compensated at the employee's regular rate of pay or, if applicable, the premium rate that may be required . . . .

Wage Order 16 ¶ (5)(A) (emphasis added).

As an initial matter, Sachs notes that paragraph 5 of Wage Order 16 goes on to instruct that

"[t]his section shall apply to any employees covered by a valid collective bargaining agreement unless the collective bargaining agreement **expressly provides otherwise**." Wage Order 16 ¶ 5(D) (emphasis added); *see also* Sachs's Motion at 22. Sachs thus argues that Plaintiff is barred from obtaining compensation under paragraph 5(A) of Wage Order 16 because "the [parties'] CBA expressly provides for compensation only after reporting to a location between 8:00 a.m. (reporting time at the parking) and 4:30 p.m. (employees' arrival at the parking lot after work)." *See* Sachs's Motion at 22. Plaintiff responds that "[t]he CBA nowhere even mentions paragraph 5 of the Wage Order, let alone 'expressly provide' that paragraph 5 does not apply." *See* Plaintiff's Opp'n at 21.

The Court agrees with Plaintiff that the CBA does not preclude Plaintiff's request for compensation pursuant to paragraph 5 of Wage Order 16. *Burnside v. Kiewit Pacific Corp.*, 491 F.3d 1053 (9th Cir. 2007) is instructive. In *Burnside*, the Ninth Circuit held that "the right to be compensated for employer-mandated travel exists as a matter of state law, independent of [] CBAs." 491 F.3d at 1061. The Ninth Circuit went on to analyze paragraph 5 of Wage Order 16 and ruled that "if the [operative] CBA says nothing at all about pay for travel time, the right to be paid for that time still exists." *Burnside*, 491 F.3d at 1064. In other words, the CBA must make an "express waiver, as contemplated by section 5(D) of Wage Order 16" to preempt "the right codified in section 5(A)." *Id.* at 1071. Here, as pointed out by Plaintiff, the parties' CBA is silent as to compensation for travel time. *See generally* CBA, Ex. D to Rega Decl., ECF 40-5; *see also* Plaintiff's Opp'n at 22. The CBA's description of the work day and workweek, *see* CBA § 3.01, is simply not an express waiver of Plaintiff's underlying state law right to be compensated for employer mandated travel, *see Burnside*, 491 F.3d at 1061, 1064, 1071. Thus, the CBA does not bar compensation under paragraph 5 of Wage Order 16.

However, the Court finds that Plaintiff's brief stop at the guard shack to enable scanning of his badge was not a "location where the employee's presence is required" within the meaning of Wage Order 16 ¶ 5(A). In the instant action, Plaintiff and fellow workers traveling by car were required to present their badges at the guard shack in order to enter through the Security Gate. *See* Griffin Depo. at 34:11–24. But, whether driving or riding, workers were not required to exit the

car—they simply held up their badges for scanning by the person(s) manning the guard shack. *See id.* at 37:1–16; 40:13–22; 42:23–43:14. This obligation is no different than that of any employee who enters a work campus or premises that requires scanning an employee badge to gain access. In the only case cited by Plaintiff in support of his paragraph 5(A) theory, the first location was "a designated site . . . [at which] [the employer's] managers instructed the employees on the day's tasks and had them retrieve equipment" before "travel[ing] in company vans or pickup trucks." *Burnside*, 491 F.3d at 1056. Although the *Burnside* court did not rule whether these requirements constituted "the first location where the employee's presence [was] required," *see* Wage Order 16 ¶ 5(A); *Burnside*, 491 F.3d at 1070, the requirements are nonetheless indicative of what facts might rise to that level. By contrast, here, Plaintiff drove his own vehicle, did not exit his vehicle, and simply presented his badge for scanning. It is simply illogical that merely scanning a badge to gain access triggers the right to compensation under Wage Order 16. If so, a massive swath of squarely non-compensable walking or commute time from the first "badge" checkpoint of a given work location would be covered by paragraph 5(A).

In sum, the Court finds that as a matter of law, Plaintiff's pass through the Security Gate was not "the first location where Plaintiff's presence was required" and that Plaintiff is not entitled to compensation for his travel time on the Access Road under Wage Order 16 ¶ 5(A).

### 4. Conclusion

The Court finds that Plaintiff's travel time on the Access Road is not compensable under Wage Order 16 and California law. Accordingly, Sachs's motion for summary judgment of no liability under Plaintiff's first cause of action is GRANTED and Plaintiff's cross-motion for summary judgment of liability is DENIED.

### B. Plaintiff's Remaining Class Claims

Sachs moves for summary judgment that Plaintiff's remaining class claims against Sachs fail as a matter of law because they are entirely derivative of Plaintiff's first cause of action. *See* Sachs's Motion at 2; Sachs's Renotice of Motion at 2. The Court is unable to identify any opposition by Plaintiff to Sachs's motion for summary judgment on this issue. Moreover, the Court agrees that Plaintiff's remaining class claims (claims 2 through 6 of the Consolidated

34

Complaint) are entirely derivative of claim 1. Accordingly, having granted summary judgment in Sachs's favor with respect to claim 1, the Court hereby GRANTS summary judgment in Sachs's favor with respect to the remaining class claims.

### C. Plaintiff's Individual Claims

Plaintiff alleges three individual causes of action: Fair Employment and Housing Act ("FEHA") violation under California Government Code § 12940; intentional infliction of emotional distress; and wrongful termination in violation of California public policy. *See* Claims 7 to 9, Consol. Compl. ¶¶ 81–110, ECF 51. These individual claims are brought against Sachs only. Plaintiff is African American and alleges that he "was mistreated because of his race" and that he "was treated differently than other workers who were not African American." *See id.* ¶¶ 83, 84. In addition, Plaintiff alleges that he "questioned [Sachs's] failure to pay employees for all time worked . . . . [including] from the point at which they badged in at the security entrance." *Id.* ¶ 107. Plaintiff hypothesizes that "[Sachs] terminated Plaintiff because of his race or because he had complained about [Sachs's] wrongful conduct." *Id.* ¶ 108.

Sachs moves for summary judgment as to all three individual claims on the basis that Sachs had legitimate and non-discriminatory grounds to terminate Plaintiff. *See* Sachs's Motion at 2; Sachs's Renotice of Motion at 2. Specifically, Sachs argues that "Plaintiff has no evidence that he was treated any differently because [of his race]" and that "[e]ven assuming that Plaintiff can make a prima facie case, Sachs is able to satisfy its burden of producing evidence that it terminated Plaintiff for a legitimate, non-discriminatory reason." *See* Sachs's Motion at 22, 23. Sachs walks through the *McDonnell Douglas*[6] burden-shifting framework that applies to FEHA claims and presents evidence pertaining to Sachs's "legitimate, non-discriminatory reason for [terminating Plaintiff]." *See* Sachs's Motion at 23–24. In addition, Sachs discusses the purported absence of evidence that "is specific or substantial to demonstrate that Sachs['s] proffered termination reason was a pretext for discrimination." *See id.* at 24–25.

Plaintiff worked for Sachs on the Project from approximately November 20, 2016 to

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

March 3, 2017.  *See* Griffin Decl. ¶ 3, ECF 50-2.  Sachs's evidence shows that Plaintiff received a written warning on December 13, 2016, citing failure to follow instructions and improper conduct, including "yelling back to foreman."  *See* Warning Letter, Ex. E to Rega Decl., ECF 40-5; Rega Decl. ¶ 14; Griffin Depo. at 131:8–22.  The Warning Letter stated that "[m]oving forward [Plaintiff] has been placed in another crew."  *See* Warning Letter.  Plaintiff signed this warning letter, acknowledging that he had "read this warning and agree to correct the situation . . . . [and] understand that future violations may be cause for discharge."  *See id.*  Plaintiff subsequently was absent from work multiple times in early 2017, only working about half of the shifts he was scheduled to work in the first quarter of 2017.  *See* Rega Decl. ¶ 15; Kinloch Decl. ¶ 8.  Plaintiff missed work on January 2, January 17, February 23, March 1, and March 2, and only appeared for work for a total of seven days in the first quarter of 2017.  *See id.*; Griffin Payroll Records, Ex. F to Rega Decl., ECF 40-5.  On March 3, 2017, Plaintiff received another written warning, citing failure to follow instructions, insubordination, leaving job without permission, and poor productivity.  *See* Rega Decl. ¶ 17; Second Warning Letter, Ex. H to Rega Decl., ECF 40-5.  Plaintiff refused to sign this warning letter.  *See id.*  The same day, Plaintiff was given notice of termination due to "absenteeism" and "refus[al] to work as directed."  *See* Rega Decl. ¶ 18; Notice of Termination, Ex. I to Rega Decl., ECF 40-5.

The Court finds this evidence more than sufficient to satisfy Sachs's burden of producing evidence establishing a legitimate, non-discriminatory reason for terminating Plaintiff.  *See Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1145–46 (9th Cir. 2017).  Therefore, the burden shifts to Plaintiff, who "must raise a triable issue suggesting that the employer's proffered reason is mere pretext for unlawful discrimination, or offer other evidence of discriminatory motive."  *See id.* at 1146.

Plaintiff has utterly failed to make such a showing.  In response to Sachs's motion for summary judgment on his individual claims, Plaintiff submits exactly one paragraph—a total of eight lines—in opposition.  *See* Plaintiff's Opp'n at 25.  Within these eight lines, Plaintiff makes the conclusory argument that "Plaintiff's evidence demonstrates that the reasons for his termination were pretextual and in fact false" without any discussion whatsoever of the evidence.

See id. Instead, Plaintiff makes a single citation to 89 paragraphs of his declaration—which in total run over 17 pages—without discussing any of the content. *See* Plaintiff's Opp'n at 25 (citing Griffin Decl. ¶¶ 74 –162). On summary judgment, "[w]hether the evidence is attached or not, Rule 56(e) requires that the adverse party's 'response,' not just the adverse party's various other papers, 'set forth specific facts' establishing a genuine issue." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (citing Fed. R. Civ. P. 56(e)). In other words, "[t]he gist of a summary judgment motion is to require the adverse party to show that it has a claim or defense, and has evidence sufficient to allow a jury to find in its favor on that claim or defense." *See id.* Only if the "opposition sets it out, [does] the movant ha[ve] a fair chance in its reply papers to show why the respondent's evidence fails to establish a genuine issue of material fact." *See id.*; *see also Desilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.").

Applying these principles to Plaintiff's eight lines of opposition, Plaintiff is left with only the single assertion that "Plaintiff complained about Sachs['s] pay practices only days before he was fired." *See* Plaintiff's Opp'n at 25. But, Plaintiff fails to provide citation or evidentiary support for even this single assertion.

In sum, Plaintiff's opposition to Sachs's motion for summary judgment as to Plaintiff's individual claims is wholly insubstantial to establish pretext or raise a genuine issue of material fact as to any of the claims. Accordingly, the Court hereby GRANTS summary judgment in Sachs's favor with respect to Plaintiff's individual claims.

//
//
//
//
//
//
//
//

1  **V.  ORDER**

2  For the foregoing reasons, IT IS HEREBY ORDERED that:

3  1.  Sachs's motion for summary judgment as to Plaintiff's first cause of action for failure

4  to pay compensation for travel time is **GRANTED** and Plaintiff's cross-motion for

5  summary judgment of liability on the same issue is **DENIED**.

6  2.  Sachs's motion for summary judgment that Plaintiff's remaining class claims (claims 2

7  through 6 of the Consolidated Complaint) are entirely derivative of claim 1 and

8  therefore fail as a matter of law alongside claim 1 is **GRANTED**.

9  3.  Sachs's motion for summary judgment as to Plaintiff's individual claims (claims 7

10  through 9 of the Consolidated Complaint) is **GRANTED**.

11

12  **IT IS SO ORDERED.**

13  Dated: May 28, 2019

14  

15  BETH LABSON FREEMAN
United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28